THE PEOPLE, APPELLANTS, v. JARVIS LORD AND JOHN LEAHEY, RESPONDENTS.*

*Contract for public work — bids for — conspiracy to prevent competition — right of party defrauded.*

The complaint in this action alleged that the canal contracting board, in pursuance of the requirements of the Constitution and statutes of this State, gave notice of the letting of certain work by contract, and advertised for bids therefor ; that the defendant and other persons (who had intended to put in bids), unknown to the plaintiff, met together, and agreed to put up at auction the privilege of bidding for the work, and the right to control all bids put in, with the intent that the purchaser of such right and privilege should destroy and omit to put in all of such bids, as offered to do the work at fair and reasonable prices ; that the defendant purchased such right, and in pursuance of the agreement destroyed all such bids as were fair and reasonable, and lower than his own, and did himself put in a bid largely in excess of a fair value; that the contracting board, in ignorance of these facts, awarded the contract to him, and paid him the amount due thereunder. *Held*, that a demurrer to the complaint, on the ground that it did not state a cause of action, should be overruled, and that an action could be maintained to recover the amount of the damages sustained by the plaintiff in consequence of the fraudulent acts of the defendant.

*Quœre*, whether the principle of this decision would apply to merely private contracts.

APPEAL from a judgment dismissing plaintiff's complaint.

At the trial, upon the plaintiff's opening the case, the defendants moved to dismiss the complaint, on the ground that it did not state facts sufficient to constitute a cause of action. The motion was granted *pro forma*, on the strength of a former decision at the Circuit by another judge, and the plaintiff's counsel excepted. From the judgment thereupon entered the plaintiffs appeal. And the question is here argued without objection, as if upon a demurrer to the complaint. The complaint sets up in brief, that the contracting board had given notice of a letting by contract of certain work on the canals, to the lowest bidder, on the 28th of December, 1866. The work was the keeping in repair the Chemung canal and feeder for five years. The complaint further · alleged that a number of persons attended, on that day, prepared

* This case was decided at the November Term, 1875.

to bid for the work, and to give adequate security; that on that day, and before the hour when the bids were to be put in, the defendants and other persons to the plaintiffs unknown, assembled and organized a meeting; that at said meeting the defendants and such other persons put up at auction among themselves, the privilege of bidding for the work aforesaid, and the right to control all the bids which were to be put in; that it was agreed between the defendants and said other persons, among themselves, that the person who would pay the most for the sole privilege of bidding for said work, should receive said bids and control the same, to the end, and with the intent that such persons should destroy and omit to ·put in such of said bids as offered to do said work at fair and reasonable prices; that the defendants were present and did buy all such bids at said meeting, and paid to the aforesaid persons, unknown to the plaintiffs, large sums of money to induce them to withdraw from said bidding and competition, and to omit to put in said bids, and surrender them to the defendants; that said persons, unknown to the plaintiffs, did receive said money, and in consideration thereof did withdraw from the competition, and omit to put in bids and surrender their bids to the defendants, to the intent that such as were lower than that of Leahey, one of the defendants herein, should be destroyed; that thereupon the defendants did destroy such of said bids as were *fair* and *reasonable* and *lower than* that of said Leahey; that thereupon the defendants, in the name of defendant Leahey, put in a bid at $36,000 per annum; that the rates in said bid were *largely in excess of a fair value*, and largely in excess of the bids so surrendered and destroyed; that the contracting board opened and canvassed the bids, in ignorance of all these facts, and awarded the contract to said Leahey, for five years, at $36,000 per annum; that on December 31, 1866, Leahey assigned the contract to defendant Lord, who took with full knowledge of the foregoing facts. That the contract has expired by its limitation; that the plaintiffs have paid to Lord thereunder $180,000; that $25,000 per annum would have been a fair price for the work; that if the board had known of this fraud they would not have awarded the contract to Leahey. And the complaint repeatedly alleges, that these acts of the defendants and the said persons unknown, were done with intent to

deceive and defraud the plaintiffs, and it avers that the plaintiffs have been thereby damaged in the sum of $55,000, which sum they seek to recover.

*Matthew Hale,* for the appellant. The motion to dismiss the complaint should have been denied, upon the familiar principle that fraud, coupled with damage, will sustain the action. (*Upton v. Vail,* 7 Johns., 181; *Barney* v. *Dewey,* 13 id., 224; *Culver* v. *Wright,* 7 Wend., 380; *Monell* v. *Colvin,* 13 Johns., 395.) These acts were a fraud on the State. Any combination on the part of the purchaser to lower prices by inducing persons not to bid, or on the part of bidders, at a letting by public competition, to raise prices, by inducing others not to bid, is a fraud. (*Jones* v. *Caswell,* 3 Johns. Cas., 32; *Gulick* v. *Ward,* 5 Halst., 87; *Thompson* v. *Davies,* 13 Johns., 112, 114; *Shiffen* v. *Stickney,* 3 Metc., 384; *Atcheson* v. *Mallon,* 43 N. Y., 147; *Woodworth* v. *Bennett,* id., 273; *Marsh* v. *Russell,* 2 Lans., 340, 344; *Gardener* v. *Morse,* 25 Me., 140; *Doolin* v. *Ward,* 6 Johns., 194; *Wilbur* v. *Howe,* 8 id., 446; *Bristane* v. *Adams,* 3 Comst., 129.) The defendants were engaged in an unlawful act which resulted in damage to the plaintiffs. The Constitution provides that all contracts for work on the canals shall be made with the lowest bidder. (§ 3, art 7, as amended 1854; chap. 329, of 1854 [3 Stat. at Large, 183], §§ 8, 9; chap. 105, of 1857 [3 Stat. at Large, 190], § 1; chap. 348, of 1862 [3 Stat. at Large, 204.) The object of these provisions was to secure to the State the benefit of actual competition, among persons disposed to engage in the business of making repairs on the canals. The respondents admit by their motion, that they entered into a combination and conspiracy to induce the plaintiffs to let the work at higher rates than it was worth, and at higher rates than those at which they might otherwise have procured it to be done, and with the intent to deceive and defraud the plaintiffs by depriving them of the benefit of a fair and honest competition. The defendants, then, were guilty of a conspiracy to prejudice, defraud and rob the State, for which they were liable to indictment. (Whart. Am. Crim. Law., 688, 689; *People* v. *Frisbie,* 14 Wend., 9; *Rex* v. *Tarrant,* 4 Burr., 2106; *Rex* v. *Seward,* 1 Ad. & Ell., 706.) In such case the injured party has a civil remedy for the wrong against

all the parties to the conspiracy. (Add. on Torts, 31, 32, 590; *Gregory* v. *Duke of Brunswick*, 6 M. & Gr., 205; *Jones* v. *Baker*, 7 Cow., 445; Add. on Torts, 1; 1 Hill. on Torts, 94; *Rigby* v. *Hewitt*, 5 Exch., 243.)

*R. W. Peckham*, for the respondents. Between an action to recover the purchase-price of the bid sold, and the action on the part of the State to recover damages for the alleged fraud in purchasing and not putting in the bids, the difference is broad and marked. The failure to put in the bids purchased, or their destruction, was not fraudulent unless it was a fraud to purchase them. It was not a fraud, unless there was a misrepresentation on the part of defendants, or a fraudulent concealment of a fact, in not disclosing to the State authorities that such a purchase had been made. The defendants were under no obligation, that courts of justice can notice, to inform the State officials of the existence of any such purchase. (1 Story Eq., §§ 204, 206, 207; *Laidlaw* v. *Organ*, 2 Wheat., 178; Willard's Eq. [Potter's ed.], 150; paging at bottom 177; id., 151; 2 Kent's Com., 490, 491, and note to 12th edition by Holmes, Jr.)

LEARNED, P. J.:

There is no doubt that, morally, the defendants committed a fraud on the plaintiffs. The question is whether their act was such that the law will compel them to compensate the injured party.

It is important to see exactly what the alleged act was. In the course of the argument it was said, on behalf of the defendants, that the purchase of a bid was not a fraud; that, in like manner, the destruction of a bid was not a fraud; and that in concealing the fact of such purchase and destruction the defendants made no fraudulent concealment, because the State placed no trust or confidence in them as regarded this matter.

But it must be observed that the transaction was not the mere purchase and destruction of bids. It was an affirmative agreement among the parties present at the meeting, that no one should bid except that party who should pay to the others the highest price for the privilege. It was, therefore, a plain agreement among

themselves against competition, admitted to have been made with fraudulent intent, and to have been designed to depress prices. The surrender and destruction of the bids which had been previously prepared, were only the means of carrying out the agreement. The gist of the agreement was that, in consideration of money paid by the defendants, the other parties would not bid for the contract, and the object was to compel the State, if possible, to pay more for the work than it would have cost at fair prices or open competition.

It is not questioned that such an agreement is void. (1 Story's Eq., § 293; *Jones* v. *Caswell*, 3 Johns. Cas., 29; *Atcheson* v. *Mallon*, 43 N. Y., 147.) The reasons given are that such an agreement is unconscientious and against public policy, and has a tendency injuriously to affect the character and value of sales at public auction, and to mislead private confidence; that it operates *as a fraud* on the sale; that it is contrary to morality and sound policy; that it deprives the person selling of the opportunity of obtaining a full equivalent for the property. It is, therefore, evident that the reason why such an agreement is held to be void, is not any wrong which the parties thereto have done to *each other*, or any want of consideration for the agreement or the like; but the reason is that the agreement operates as a *fraud upon another person ;* that is, the person whose property is put up at auction. In declaring the invalidity of such agreements the courts have, therefore, necessarily declared that such agreements tended to *defraud* the person who sells property at auction. That is to say, that if such an agreement be carried out, and that if the person selling the property, thereby obtain a less price than he would otherwise have received, and less than a reasonable price, he has been actually *defrauded* by means of the agreement, and has not merely suffered a loss for which no one was to blame. And because such agreements tend to produce this fraudulent result, they are held to be void.

Upon the same general principle, the employment of by-bidders, or puffers, by the seller at an auction sale, is a fraud. (*Bexwell* v. *Christie*, Cowp., 396.) The principle is applied to the letting of contracts as well as to the sale of merchandise. Thus, where, in the case of a letting of work on the canal, certain persons agreed for

the consideration of $400, paid by a higher bidder, to withdraw their bid, the court held this agreement to be illegal, and refused to enforce a division of the $400 among the parties. And the court said the transaction was " contrary to public policy and illegal, * * * and tended to destroy that honest competition which public bidding is designed to secure." (*Woodworth* v. *Bennett*, 43 N. Y., 273.) Again, where the postmaster-general had given notice for proposals for conveying the mail, and the plaintiffs intended to make proposals and to try to obtain the contract, and the defendants agreed to pay them $1,000 if they would not make such proposals, the agreement was held to be illegal. (*Gulick* v. *Ward*, 5 Halst., 87.)

The question then, which presents itself here is this : When an agreement is so injurious to the public and so likely to defraud some third party, that the courts refuse to enforce it, and when such a fraudulent agreement has actually caused, as it was intended to do, a loss and injury to some third party, who is entirely innocent; shall he be without redress ? If the courts will not compel a division of the gains made under such an agreement, because they were obtained by fraud, ought the courts to refuse to restore these gains to the person from whom they were fraudulently obtained ?

To answer these questions we may first notice some cases analogous, but not identical in principle. If by-bidders are employed at an auction, the purchaser is not bound to complete his purchase. (*Howard* v. *Castle*, 6 Durn. & East, 642 ; see also *Crowder* v. *Austin*, 2 Car. & P., 208; *Wheeler* v. *Callier*, 2 Mood & M., 123.) In *Veazie* v. *Williams* (8 How. [U. S.], 134), the defendant Williams sold some real estate at auction ; without his knowledge the auctioneer made fictitious bids; Veazie, the plaintiff, thereupon purchased the property at $40,000 ; he received a deed, paid a part in cash and gave notes for the balance; $14,000 remained unpaid at the time of the commencement of the action. The sale was in 1836 ; the alleged fraud was discovered in 1840, and the action was commenced in 1841. The court held that the transaction was a fraud on the purchaser, and required the seller to refund to him all over $20,000, that being the highest real bid.

Now, on behalf of the defendants here, it may be truly said that in those and similar cases, there was the affirmative act of pro-

curing fictitious bids, and that the purchasers were deceived by these bids. But, when we examine the nature of the alleged deception we shall see that, in substance, it is the same which was practiced in the present case. Fictitious bids are not misstatements as to the condition or quality of the thing sold. The buyer may exercise his judgment, and may examine, so far as possible, the property for which he is bidding; and when he knows its condition and quality, and voluntarily offers so much for it, on what ground can he claim to have been defrauded by the mistaken idea that some other person offered a certain other sum? The ground, as stated by Lord MANSFIELD in the case above cited, is this: " The basis of all dealings ought to be *good faith.* So more especially in those transactions, where the public are brought together in a confidence that the articles set up for sale will be disposed of to the highest bidder." Although then, the purchaser be thoroughly acquainted with the property to be sold, so as to be capable of judging correctly as to its value, still he is defrauded by the employment of by-bidders; and this, because an auction sale demands good faith on both sides; no by-bidding on the part of the seller, no agreement against competition on the part of the buyer. And just as the employment of by-bidders is a fraud on the buyers, so an agreement against competition is a fraud on the seller. Each is a violation of the true and fair intent of such sales. Each shows its fraudulent character by the secrecy with which it is carried out.

And since the courts have held that an agreement against competition, intended to depress prices, is a *fraud,* or tends to produce a *fraud* on the *seller,* it would seem to follow that they have held, that, as to him, such an agreement is a wrongful act. To illustrate: a mere neglect to bid at a sale might diminish the price which the seller would obtain, but it would be no fraud or wrong. But an agreement not to compete, intended to depress prices, is characterized as a *fraud* upon the seller, and must, therefore, have been considered a wrong toward him.

And we may see how strongly the courts insist on perfect fairness at such sales, from the case of *Cocks* v. *Izard* (7 Wall., 559). There, at a judicial sale, a person caused it to be understood that he was bidding for the owner. Other persons voluntarily refrained

from bidding, and the property was struck off to him. The sale was set aside, for " the law will not tolerate any influence likely to prevent competition at a judicial sale." In that case there was no agreement not to compete. The same doctrine is recognized in *Fuller* v. *Abrahams* (6 Mood, 316); *Johnson* v. *La Motte* (6 Rich. Eq., 347); *Plaster* v. *Burger* (5 Ind., 232).

Now, on behalf of the defendants, it is said that the present case differs from the cases above cited, and others like them, in these particulars: that those were cases of judicial sales; and, also, that, in the present case, the contracting board acted voluntarily in accepting the bid; and that they had the right, if they chose, to reject all bids.

The principle of law which forbids the employment of by-bidders applies to private as well as to judicial sales, as will appear by the cases already cited.

Whether the principle which declares agreements against competition, made to depress prices, to be void, is equally extensive, we need not now say. For, although the letting of these contracts was not done under any judicial proceeding, still it was not the case of a private person, who was about to build, and who had, by his own choice, advertised for proposals. The letting was done under the requirements of the law. The fair and true intent of the law ought to be enforced by the courts, as much as in a sale under their own authority. The contract was, by the Constitution, to be made with the lowest bidder (art. 7; § 3, amended 1854), and statutes had been passed to carry out this provision. And the illegality of agreements against competition, as between the parties in the case of such lettings, is declared in *Gulick* v. *Ward* and *Woodworth* v. *Bennett* (*ut supra*). Thus, such lettings, made under the authority of the law, have been recognized to be subject to the same rule, in this respect, as judicial sales.

Again, the plain object of the Constitution and the statutes is to obtain for the State, in respect to these contracts, the benefit of fair and open competition. The intent of the defendants was to thwart that object, and such was the result. Their combination had that end, and no other, except their own gain.

But it is said that the board might reject all bids if they did not consider them advantageous. Of what use would that be? The

board must advertise again. If parties might lawfully make an agreement against competition once, they might do so again; so that a second advertisement for the letting of these contracts would have had the same result with the first. It would be useless to reject these bids and to have new biddings, when the same combinations against competition could be repeated over and over again, with the sanction of law. In a judicial sale the officer must sell; he must sell at auction; he must sell to the highest bidder. So with the contracting board. They must have the work done; they must advertise for biddings; they must let by contract to the lowest bidder. There is, therefore, little analogy between them and a private individual. He may build or not, as he chooses; may let his work by contract or not, as he chooses; may select the highest or the lowest bidder, as he chooses. It is not, therefore, necessary to the decision of the present case to inquire how far these principles apply to merely private contracts.

But the objection that the contracting board acted voluntarily in accepting the bid will be answered by a reference to the cases already cited, of by-bidding. In those cases, too, the purchaser acts voluntarily. He need not buy if he thinks the property has been carried beyond its value. His bid is a voluntary expression of his own offer. Yet he is not bound thereby if by-bidders have been employed. So the contracting board acted voluntarily in accepting the bid. But the means employed by the defendants to obtain the acceptance were contrary to the object of requiring public competition.

There are some cases which touch this question more directly. In *Dudley* v. *Little* (2 Ham. [Ohio], 504), a tax sale and deed were set aside, because there had been a combination among several persons that one of them should bid in the land to prevent competition.

In *Phippen* v. *Stickney* (3 Metc., 387), in a carefully considered opinion, the court held that an agreement not to compete would be fraudulent, if the intent were to prevent competition and depress the price.

The case of *Breslin* v. *Brown* (34 Ohio State, 565), was one where a contract for public improvement was to be let to the lowest bidder. The plaintiff had put in a bid, and he and the

defendant then agreed to become partners in the matter. The defendant also put in a bid, which proved to be the lowest. The court said that " any agreement entered into for the purpose of preventing competition is not only void, but it *renders any sale void at the option of the seller.* * * * Fair competition among bidders, to the end that sellers may be protected against fraudulent combination, is all the law seeks to secure." And in that case the court held that there was no intent to prevent competition, and that no injury to the seller resulted. But the doctrine was asserted that a combination to prevent competition, made with fraudulent intent and to depress the price, renders the sale void. These decisions, therefore, all support plaintiffs' views ; since it is admitted in the present case that the object of the defendants was to defraud the plaintiffs and to increase the price, and that such was the result.

Again, it is said on behalf of the defendants that there was no misrepresentation. But in a sale at auction, unfair dealing and bad faith may come from other sources than actual misrepresentation. In the many cases where agreements against competition have been held to be illegal and null, such illegality and nullity are not placed on the ground of a false representation to the seller. By-bidding prevents fair competition indirectly. An agreement not to bid made to depress prices prevents it directly. "Perfect freedom from all influence likely to prevent competition in the sale should be in all such cases strictly exacted." (*Slater* v. *Maxwell*, 6 Wallace, 268.)

We have been referred by the defendants' counsel to the case of *Jones* v. *North* (19 Equity Cases [Law Rep.], 426). In that case a corporation invited tenders for a supply of stone. The plaintiff agreed to purchase a certain quantity of stone from the defendant and from two other several owners of quarries.

In consideration thereof the defendant agreed not to send in any tender or to furnish any stone to the corporation. The owners of the other quarries were to put in tenders above the plaintiff's. The plaintiff sent in a tender, and the defendant, in violation of his agreement, also sent in a tender, which was accepted by the corporation. This action was brought to restrain him from furnishing any such stone to the corporation. A demurrer to the bill was overruled.

But in that case several things must be noticed. So far as appears, the corporation was not required by law to purchase by contract with the lowest bidder. It was, therefore, in the position of a private individual. Secondly. The corporation had not, in fact, been injured. The defendant had broken the agreement and had made a tender. This was presumably lower than the plaintiff's and was accepted. And the court says that if by this action the defendant should be prevented from fulfilling his contract, the corporation could recover damages against him by an action at law. The corporation had secured, and could not be deprived of the benefit resulting from a breach of the agreement between the parties. Third. The court says nothing about the agreement against competition, but only states that it was lawful for the owners to sell their commodities to each other, although with knowledge that the purchaser was about to supply the corporation. Fourth. There is no allegation that the object of the agreement was to defraud the corporation. Finally, if the case holds that an agreement not to compete, made with intent to depress prices, is valid between the parties, it is contrary to the law of our State. (*Atcheson* v. *Mallon*, 43 N. Y., 147.)

If any doubt could exist whether, after actually entering into the contract with the defendants, in ignorance of the fraud and after the contract had been carried out and settled in such ignorance, the State could now, on discovery of the fraud, have redress; that would seem to be settled by the case of *Veazie* v. *Williams* (*ut supra*).

The defendants further urge that these views demand of them a higher degree of morality than is required in any other business. We think not. It is no hard rule to say that men shall not combine, with fraudulent intent, to deprive the State of the benefit of that fair competition which the Constitution and the statutes contemplate. Not to enter into such combinations is only simple honesty.

The judgment should be reversed and a new trial granted, costs to abide the event.

Present — LEARNED, P. J., BOOKES and BOARDMAN, JJ.

Ordered accordingly.